UNITED STATES of America,
Plaintiff,

v.

HANNA NICKEL SMELTING COMPA-
NY, a corporation and the Hanna Min-
ing Company, a corporation, Defend-
ants.

Civ. No. 63–530.

United States District Court
D. Oregon.

Feb. 24, 1966.

Supplemental Opinion April 27, 1966.

Sidney I. Lezak, U. S. Atty., James H. Prentice, Robert Mandel, Lewis H. Gold,

Attys., Dept. of Justice, Portland, Or., for plaintiff.

Koerner, Young, McColloch & Dezendorf, James C. Dezendorf, Portland, Or., for defendants.

SOLOMON, Chief Judge:

The Government filed this action on November 8, 1963, to recover $1,738,598 from defendant Hanna Nickel Smelting Company (hereafter called either the "Smelting Company" or the "Company") for breach of the accounting provisions of a government contract. The Government also seeks to reform two later agreements between the parties and demands an additional $249,598.

During the Korean War, Government defense officials determined to increase the domestic production of nickel. The Hanna Coal & Ore Company, predecessor to defendant Hanna Mining Company (Mining Company), held extensive leases on Nickel Mountain near Riddle, Oregon. Negotiations between Hanna and the Government started in 1951, and on January 16, 1953, they signed Contract DMP-49. Hanna agreed to develop a mine on Nickel Mountain, and the Government agreed to buy enough ore to produce 125 million pounds of nickel.[1]

Simultaneously, the Government and the Company (a subsidiary of Hanna Coal & Ore) signed Contract DMP-50 to build and test an experimental nickel smelter at Riddle. Under this contract, the Government agreed to finance the capital expenditures and operating costs of the smelter, subject to ceilings and limitations. The Company agreed to contribute only the real property.

If the smelting process did not prove feasible, contract DMP-50 would by its terms terminate. When tests established that the smelting process was successful, the Company became obligated, at no profit to itelf, to deliver 125 million pounds of nickel to the Government. The delivery price was based on (1) the Company's actual cost of production (subject to a varying ceiling) and (2) an amount sufficient to amortize the Government's capital advances plus interest. The capital advances were to be amortized over the first 95 million pounds, so that the last 30 million pounds were to be delivered at the Company's cost of production.

The Government's advances for both capital and working capital were to be credited against the invoice price of nickel. So long as the Smelting Company borrowed its funds from the Government and kept its costs within the contract ceilings, it was, in effect, operating the smelter for the Government.

This arrangement had advantages for the Hanna Companies. The Mining Company was to make a profit on its sales of ore to the Government. The Smelting Company was to pay the Mining Company $100,000 per year after September 30, 1955, in return for management supervision. This cost of production would, in turn, be charged by the Smelting Company to the Government. The Government, rather than the Smelting Company assumed the risks inherent in testing a new process. Moreover, the Smelting Company had an option to purchase the smelter for commercial use at the end of the contract period at a fraction of its value—$7\frac{1}{2}$ per cent of the Government's total capital advances.

The contract imposed an absolute ceiling of $22,875,000 [2] on capital advances, and specified the purposes for which such advances could be used. It also provided for Government review and approval of capital expenditures. The contract lim-

---

1. Contract DMP-49 is not in dispute in this action. Hanna Mining Company is named as a defendant because it agreed in Contract DMP-51 to reimburse the Government for any funds expended by the Smelting Company in violation of Contract DMP-50.

2. The original ceiling of $22,000,000 was increased on November 8, 1957, to $22,-875,000. The Smelting Company borrowed $22,300,000 in capital advances. It repaid $77,819.57 in cash and credited the balance of the remaining principal and interest against the invoice price of nickel.

ited to $3,750,000 [3] the amount of outstanding working capital advances.

In this action, the Government claims that the Company breached Contract DMP–50 by charging many capital items to expense accounts and by including them in actual costs of production. Because of the contractual limitations on capital expenditures, the Government contends that the Company's accounting practices increased the price of nickel to the Government.

The Government initially objected to 284 items. It now admits that 68 were properly expensed and claims $1,392,376.-55 based upon the remaining 216 items.

The company contends that its accounting practices were consistent, proper, and permitted by the contract. In addition, it asserts that the Government is barred from maintaining this action because of its long-continued acquiescence in these accounting practices.

A separate trial was held in October, 1964, on the equitable defense. Later I concluded that I should hear all of the evidence before deciding any issue. The remaining issues were tried in July, 1965, after which the parties submitted voluminous briefs. All of the issues are now presented for decision.

### Secondary Claims

The Company exercised its option to purchase the smelter in March, 1961, after delivering 105 million pounds of nickel under the contract. A new agreement required the Company to complete its original delivery obligation at 58.77 cents per pound or its actual cost of production, whichever was lower.

The Government contends that the 58.77 cent ceiling price was based upon the Company's cost experience in 1959 and 1960 and that it must be revised downward if the Government's principal claim is sustained. It revised the ceiling price downward to 57.49 cents per pound by applying the Company's adjusted cost

experience to the formula purportedly used by the parties in arriving at the 1961 agreement. More than two million pounds of nickel were delivered at the 58.77 cent ceiling price, and the Government claims $27,986 under the reformation issue.

The Company argues that the 58.77 cent ceiling price was a negotiated price based not only on a formula, but also on estimates of the Company's actual cost of production. It claims that its costs were higher than expected and that the ceiling price, if reformed, should be reformed upward to 62.65 cents per pound.

In 1964, after this action was filed, the parties terminated the 1961 agreement. The Company paid $2,175,000, based upon the 58.77 cent ceiling price, in lieu of completing the required deliveries. It agreed to adjust this termination payment to accord with any reformation of the 1961 agreement. The Government seeks an adjustment of $221,612 in this action.

### The Accounting Dispute

Contract DMP–50 called for the Company to test a French smelting process known as the Ugine process. Apparently because the Government hoped to expedite production, the contract precluded the use of a pilot plant. Instead, the Company agreed to conduct preliminary tests in France and then to build the first unit of the proposed smelting facility at Riddle, Oregon. If the smelting process proved feasible, the Company agreed to enlarge the smelter to production scale.

As the Company tested various equipment and processes in the Riddle smelter, it discovered that many items required redesign or replacement with more efficient equipment. It also found that it needed new equipment to obtain maximum recovery of nickel from the ore. The Company charged some of these costs to operating expenses.

3. The original limitation of $2,800,000 was increased on November 8, 1957. The Smelting Company borrowed $69,945,000 in working capital, all of which was cred-
ited against the invoice price of nickel except for $1,045,123.69 repaid in cash after Contract DMP–50 was terminated.

In 1956, for example, ore dryer #1, installed during the testing process, proved much less efficient than dryer #2, installed during an expansion of the facility. Dryer #2 incorporated improvements based upon the Company's experience with #1. Dryer #1 was rebuilt at a cost of $56,626.27, which was charged to expense.

In 1957, the Company installed a new dust collection system at a cost of $893,364. It capitalized $694,917.38 spent for new equipment, but expensed $198,746.62, the amount spent to remove and replace the original, inadequate equipment. In the same year, the Company spent $97,372.90 to replace two undersized furnaces and $25,469.45 to convert a 24-inch conveyor belt to a 36-inch belt. Both costs were expensed.

Substantially all of the 216 disputed accounting decisions refer to similar expenditures. The Government contends that the 216 accounting decisions are inconsistent with the controlling provisions of contract DMP–50. Alternatively, it argues that the accounting for 201 items fails even to conform to generally accepted accounting practices.

The Government asserts that Articles IV, VI, and VIII of the contract, when read together, provide a clear and unequivocal accounting standard which is binding on the parties. The pertinent portions of these articles are:

### Article IV. *Facilities*

With advances made by the Government as provided in Article VI, the Contractor will construct and equip (including any necessary redesigning, rebuilding and repair) * * * a facility for the conversion of ore * * *, [which during the test period shall consist of specified equipment, including a slag-disposal site and equipment] and all equipment and facilities agreed to by the government as necessary for such conversion. * * * The facility, as it exists from time to time as contemplated by this Article or as it may be substituted for from time to time with the approval of the Government is hereinafter called "the Facility."

### Article VI. *Advances*

1. Upon the Contractor's written request, the Government will make advances (hereinafter called "Capital Advances") of the entire amount up to a total of $22,000,000 * * * required (a) to test the process [in France], (b) to construct, equip, design and rebuild the Facility contemplated by Article IV * * *, (c) for such replacements or improvements of the Facility which are agreed by the Contractor and the Government to be necessary or advisable during the period of this Contract, and (d) for such other necessary and so agreed upon expenditures which, in accordance with generally accepted accounting practice, are capitalized.

2. Upon the Contractor's written request from time to time * * *, the Government will advance to the Contractor sums (hereinafter called "Working Capital Advances") representing its reasonable minimum working capital requirements [so long as the amount outstanding does not exceed $2,800,000]. * * * Working Capital Advances may be requested and used by the Contractor to pay any costs and expenses hereunder of the Contractor * * * not covered by Capital Advances * * *.

### Article VIII. *Sale and Purchase of Ferro-Nickel*

1. The Contractor will sell to the Government, and the Government will purchase from the Contractor, all saleable ferro-nickel produced by the Facility during the period of this Contract up to a maximum of 125,000,000 pounds * * * at prices for ferro-nickel per pound of contained nickel determined by adding (a) the Contractor's actual cost of production per pound of contained nickel [subject to a varying ceiling price] and (b), but only in the case of the first 95,000,000 pounds * * *, an amount per pound * * * sufficient to amortize

the Capital Advances made pursuant to Article VI plus interest thereon. [The amortization payment is to be recalculated on the first day of each calendar year.] The Contractor's actual cost of production [shall be subject to a ceiling and] shall mean and include * * * all theretofore unrecovered costs and expenses hereunder of the Contractor * * * not covered by Capital Advances and which arise from operations, payment of royalties, management and consultants' fees, insurance, interest on Working Capital Advances, state and local taxes, or other sources.

The Government contends that the 216 disputed items are replacements and improvements of the smelter which are eligible for capital advance treatment under Article VI, paragraph 1(c). It also contends that such expenditures *must* be capitalized and financed under that provision, since the definitions of working capital and actual cost of production refer only to expenditures "not covered by Capital Advances."

The contract does not define the terms "replacement" and "improvement". The Government originally argued that *all* items which, descriptively, are replacements or improvements are included within the capital advance provision. The Government now concedes that this position is untenable and that the replacement of a light bulb, for example, is not a capital expenditure. At the beginning of the second trial, it conceded that 68 of the items originally contested were properly expensed as repair and maintenance costs.

■ I find that the terms in Article VI, paragraph 1, are ambiguous, and that other provisions relied on by the Government do not resolve the ambiguity. For example, Article VIII provides that actual cost of production shall include "all theretofore unrecovered costs and expenses of the Contractor * * * not covered by Capital Advances and arising from operations." Most, if not all, replacements and improvements arise from operations;

whether they are actual costs of production under this provision may depend on whether they were previously capitalized.

■ I find that the terms "replacement" and "improvement" as used in this contract are terms of accounting art. In determining how to account for a particular item, an accountant must look beyond the contract and rely on generally accepted accounting principles and practices.

Both parties presented expert testimony to support their constructions of the contract and their contentions on applicable accounting practices. The Government called Dr. Howard W. Wright, an accounting professor who has often been consulted on Government contracts. The Company called four accountants whose testimony was largely cumulative: Richard T. Baker, managing partner of Ernst & Ernst (the Company's auditor); Maurice Peloubet and Bruce Smith, partners in Price, Waterhouse & Co., and John W. Queenan, managing partner of Haskins & Sells.

These experts all agreed that accountants rely on a relatively small number of accounting principles and that many accounting practices have been developed to apply basic principles to various accounting situations.

Dr. Wright disagreed with the Company's witnesses on whether the Company's choice of practices was appropriate on the facts of this case. He testified that the accounting principle most applicable to this case is that costs must be matched with revenues. When an item promises to affect revenues in more than one accounting period (in this case a year), its costs should be capitalized. Only items consumed in a single accounting period should be expensed and matched against the revenue of that period. Dr. Wright distinguished between capital and expense items primarily on the basis of useful life expectancy. The Government's exhibits show that the useful life of 201 of the disputed items exceeds a single account-

ing period; in fact, these exhibits show that the Company used some of the items in the commercial production of nickel after contract DMP–50 was terminated. In Dr. Wright's view, these 201 items should have been capitalized under generally accepted accounting practices.

Dr. Wright admitted that factors other than useful life expectancy could properly influence an accountant's decision to expense or capitalize an item. In particular, he noted that the accounting principle of conservatism permits an accountant to expense many long-lived items in circumstances where future revenues are uncertain. But he contended that the principle of conservatism, and the practices developed to implement that principle, were not applicable to this smelter, because here future profits were assured.

In Dr. Wright's opinion, the Company was reasonably assured of revenue not only during the contract period, but also from later commercial production. He also listed the absence of risk to the Company under the contract and the Government's evident intention to review the Company's capital expenditures, as support for his conclusion that the Company should have employed accounting practices which favored capitalization of long-lived items. Or stated differently, he testified that the Smelting Company improperly relied on generally accepted accounting practices which implement the principle of conservatism and are applicable only in more risky situations.

The accountants called by the Company testified that, in their opinion, the Company's choice of accounting practices was proper. These witnesses prepared a schedule dividing the disputed expenditures into nine categories based upon the purpose of the expenditure rather than on the life expectancy of the items. Three of these categories, involving items costing $335,000, are readily distinguishable. I will discuss them later.

The Company's witnesses relied on the same two accounting practices to justify expensing all the remaining items even though they were grouped in six cate-

gories. They first relied on the accounting practice that treats a smelter as a single capital unit because all the component parts are devoted to the production of a single product. Under this practice, replacements or improvements, even if long-lived, are expensed unless they materially increase the capabilities or value of the plant considered as a whole.

They relied on a second accounting practice which relates to the experimental nature of this smelter and to the fact that no pilot plant was constructed. They testified that, when an inadequate item is replaced or rebuilt in an experimental operation, the cost of modification, and in some cases the cost of new equipment, is properly expensed when the modification adds no "essential value" to the plant. In their opinion, the modifications expensed by the Company enabled the smelter to achieve its originally designed capacity and added no essential value to it.

■ The evidence shows that qualified accountants differ on the propriety of applying the accounting principles and practices of conservatism to this experimental smelter. I am not impressed with the Government's argument that the principles of conservatism should not be used here because this was a relatively risk-free operation for the Company. It was risk-free only because the Government's obligation to bear all developmental costs is inherent in the contract. I find that the Company reasonably and properly employed accounting practices which reflect the experimental nature of this smelter.

■ In my opinion, the parties intended to apply accounting practices common to the smelting industry. I find that the Company properly treated the smelter as a single capital unit.

The Government's claim, insofar as it relates to items justified under either of the theories just discussed, must fail.

The first of the remaining three categories involves an accounting practice commonly called the "receding face theory". The Company's witnesses relied

on this theory to justify expensing $91,873.96 spent primarily to extend slag disposal facilities. The receding face theory was developed in mine accounting; it permits expensing the costs of improvements needed to reach and work the receding face of a mine. In a smelting operation, slag and other waste are stored in piles, and it is necessary continually to extend the dumping facilities over the growing piles. The witnesses testified that the receding face theory was properly applicable, because the new facilities did not increase the capacity of the plant, but only enabled it to continue operations.

The Government argues that the receding face theory is applicable only to mining and possibly to certain tax situations, but not to a smelter. There is no merit in this contention.

The Government also argues that, because a slag-disposal site and equipment is included in the definition of the facility in Article IV, all related expenditures must be capitalized under Article VI, paragraph 1(c), regardless of when constructed. This contention simply restates the Government's interpretation of the contract, which I have already found has no merit.

I find that the Company properly employed the receding-face theory.

The Company's witnesses testified that miscellaneous items costing less than $1,000 could be expensed as *de minimis* in a smelter of this size. Sixty-one of the disputed items, costing $34,113.79, were so classified.

The exhibits show and the Company's witnesses admitted that the Company had not routinely followed this practice and had capitalized many items costing less than $1,000. I find that the Company cannot now rely on a practice which it did not consistently employ.

The Company's witnesses also testified that many of the small items could also be justified under one or more of the practices previously discussed. I will permit the Company to attempt to reclassify any such items.

The last category in dispute involves six items, costing $215,110, which the Company's witnesses frankly admit to be capital items under the accounting practices previously discussed. The Company acquired these six items in 1960 and 1961.

After January 1, 1960, capital advance financing was less attractive to the Company than working capital financing. The contract permitted no adjustments in the amortization rate after the beginning of the year in which the 95th million pound was delivered. That delivery occurred in 1960. In other words, capital advances made after January 1, 1960, would have to be repaid in cash, rather than in nickel.

The Company witnesses testified that the six items promised to benefit the Government by reducing the cost of producing the last 30 million pounds of nickel under the contract. In their opinion, these savings promised to exceed the cost of the six items, and so the Company properly charged the items to the Government by including their cost in operating expense accounts.

I find that the Company cannot justifiably charge these admittedly capital items to expense accounts. The contract shows that the Government intended to reduce its contribution to the smelter during the last quarter of the contract period. This limitation relates to the Company's option to purchase the smelter. By the time 95 million pounds were delivered, the technical feasibility of the smelter would be established, and the smelter would be capable of processing the remaining Government nickel without further substantial capital investment. Once the smelting process proved successful, the Company probably would exercise its option; thus, capital expenditures during the last quarter of the contract would primarily benefit the Company in its commercial operations. In view of the manifest and reasonable intention of the Government to reduce its contribution, the Company should have assumed the cost of these six items itself or, if the items primarily

benefitted the Government, the Company should have negotiated a special arrangement with the Government.

### Equitable Issues

As an alternative ground of decision, I find that, with two exceptions, the Government is estopped by acquiescence from asserting any claim for expenditures made after January 1, 1958. This estoppel does not apply to the six items expensed in 1960 and 1961 solely to obtain reimbursement; the Government could not have anticipated the Company's use of this accounting method. Neither does the estoppel apply to those miscellaneous items (under $1,000) whose expensing cannot otherwise be justified, because this practice was not followed consistently by the Company.

When a party fails to speak, although he knows or should know facts which require him to speak, estoppel by acquiescence may be claimed by any other party who relies to his detriment on the first party's silence. 3 Pomeroy, Equity Jurisprudence § 818 at 250 (5th Ed. Symons).

I find that the Government knew of the accounting practices principally in dispute in 1957 but failed to protest at that time or at any time during the contract period. Its silence led the Company to continue using the practices and to increase its exposure in this action by almost $750,000.

The Government admits that it can be estopped when one of its agents, acting within the scope of his authority, makes a representation on which another relies to his detriment. But the Government asserts that the Company cannot here claim an estoppel because it did not change its accounting position in reliance on the Government's silence.

Where acquiescence is the ground for estoppel, there is no occasion for the party who claims the estoppel to change his position; he "relies" by continuing his established practice. Mahoning Investment Co. v. United States, 3 F.Supp. 622, 78 Ct.Cl. 23 (1933), cert.

denied 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934). The Company asserts that it understood the Government's silence to indicate approval of the Company's accounting practices. Had the Government objected, the Company might have been able to resolve the dispute without increasing its exposure. I find that the Company relied to its detriment on the Government's silence.

The Government also contends that the Company had no right to rely on the Government's silence since the Government was under no duty to speak. It asserts that no Government agent relied on by the Company had authority to approve the Company's accounting decisions. This argument misses the point.

The Government, like a private corporation, acquires knowledge through its agents. Under well-established principles of agency, a principal is bound by the knowledge of its agent concerning a matter upon which it is the agent's duty to give the principal information. Restatement, Agency 2d § 272. It is no defense that the agent did not, in fact, communicate his knowledge to his principal. Bowen v. Mt. Vernon Savings Bank, 70 App.D.C. 273, 105 F. 2d 796 (1939).

The evidence in this case shows that the Company consistently followed most of the accounting practices now in dispute and that Government agents, charged with the duty of investigating and reporting on the Company's accounting practices, were aware of the accounting decisions now in dispute by the end of 1957.

The distribution of the disputed items over the years of the contract illustrates the consistency of the Company's accounting:

| | | |
|---|---|---|
| 1955 – $ | 42,631.63 |
| 1956 – | 239,454.96 |
| 1957 – | 559,317.03 |
| 1958 – | 190,685.96 |
| 1959 – | 135,800.04 |
| 1960 – | 215,768.60 |
| 1961 – | 8,718.33 |
| | $1,392,376.55 |

D. A. N. Pattarson, now deceased, audited the Company's books on six occasions for the General Services Administration (GSA). He was instructed "to ascertain that: 1. funds advanced to the Contractor by the Government were expended in accordance with the terms of the contract and 2. prices charged to Government were in accordance with the terms of the contract."

Pattarson conducted his first audit from March to July, 1957, and covered the period from January, 1953, through December, 1956, during which time almost $300,000 of the expenditures in dispute were made. Pattarson relied primarily on the working papers of the Company's auditor, Ernst & Ernst. These working papers revealed the disputed expenditures and even contained memoranda on whether to expense or capitalize some of the disputed items. Mr. Jolliar, an Ernst & Ernst accountant, discussed some of the now disputed accounting decisions with Pattarson.

Pattarson's other audits, and the periods examined, were:

| Date of Audit | Period Examined |
| --- | --- |
| September, 1958 | January – September, 1957 |
| May – June, 1959 | October, 1957 – December, 1958 |
| June – July, 1960 | January – December, 1959 |
| February – March, 1961 | January – September, 1960 |
| May – June, 1961 | October, 1960 – March, 1961 |

---

At each of these audits, Pattarson saw working papers which revealed the Company's accounting practices now in dispute.

From September 17 to November 14, 1958, a three-man accounting team from the General Accounting Office (GAO) audited the Company's books at Riddle. The team was instructed "to examine the specific elements comprising the cost of production under DMP–50, and to determine the propriety of their inclusion in the cost and expense accounts." The accountants reported that they examined "production records, cost data, and records pertaining to shipping, pricing and billing of nickel." These records contained evidence of the accounting practices now in dispute.

F. James Owen, an employee of GSA, was a technical observer at the Riddle smelter from January 20, 1957, to January 1, 1959. He was instructed to maintain "surveillance of purchase orders and paid vouchers to assure that funds are charged against the proper account." Mr. Owen was an engineer, not an accountant, but his reports indicate his awareness of the company's accounting practices and additionally show that he communicated his knowledge to his superiors. For example, in 1957, he reported the alterations to ore dryer #1 and noted that "cost of material for the new ovens was mostly absorbed in previous months." In August, 1958, he reported that a new catch basin was nearing completion and that "the cost of clearing, diking, and ditching will be about $20,000 and will be charged to operating."

Whether Owen's duties can be interpreted to include meaningful reporting on the Company's accounting practices, since he was not a trained accountant, is not free from doubt. But there can be no doubt that Pattarson and the GAO accounting team were charged with the duty of auditing the Company's accounting methods and that they knew or should have known of the practices in dispute.

Whether these accountants had the authority to speak for the Government is irrelevant. The only question of authority is whether they were under a duty to report the Company's accounting practices to their superiors. I find

that their authority in this respect is clear and that their knowledge must be imputed to their superiors.

The Government raised no question about any of the now-disputed accounting decisions until July, 1961, when it questioned $210,605 expensed in 1960. The Company defended its decision to expense the questioned items and refused the Government's demand.

From August to December, 1962, five Government auditors re-examined the Company's books from January 1, 1955. As a result, the Government billed the Smelting Company on January 25, 1963, for the 284 items originally contested in this action.

I find that the Government, through its agent Pattarson, knew as much about the Company's accounting practices, with the exceptions already noted, by the end of 1957 as it knew in 1963. Particularly because the contract definition of capital expenditures was so ambiguous, the Government, in good conscience, should have informed the Company of its objections in 1957. I find that the Government was under a duty to speak in 1957.

The Government is not estopped to maintain its claims for the years prior to 1958. The Company could not have relied on the Government's silence during those years. Laches is an inappropriate defense, because the Government's action was filed within the statute of limitations applicable to a contract terminating at the end of 1957.

The Government's theory of counter-estoppel has no merit. There is no evidence that the Company acted wrongfully or failed to make its accounting decisions and practices known to the Government.

### Reformation

When the Company exercised its option to purchase the smelter in 1961, it had already delivered 105 million pounds of nickel to the Government. The parties negotiated a new agreement, Amendment No. 5, which required the Company to deliver the remaining 20 million pounds at a ceiling price of 58.77 cents per pound. This price was computed by an agreed formula which was based upon the difference between the Company's costs of production in 1959 and 1960.

I have held that the Company erroneously expensed six items totalling $215,110 in 1960 and 1961. Moreover, some of the under-$1,000 items in 1959 and 1960 may not be justified by any of the accounting practices which I have held properly applicable.

The 1961 agreement will be reformed by applying the Company's costs for 1959 and 1960, as adjusted to conform to this opinion, to the formula employed at the time of the original agreement.

By agreement this price will also be applied to the 1964 termination payment.

### Conclusion

If defendants desire to claim the disallowed miscellaneous expenses under some other theory, they should file a schedule of such claim within 20 days together with a memorandum in support thereof. Counsel for defendants shall prepare findings of fact and conclusions of law in conformity with this opinion.

### SUPPLEMENTAL OPINION

SOLOMON, Judge:

The Government brought this action to recover amounts allegedly overpaid the defendant Smelting Company for nickel delivered under Contract DMP–50.

In an opinion filed February 24, 1966, I held that the Smelting Company improperly included six items, costing $215,109.90, in the cost of production accounts chargeable to the Government.

I also held that the Company could not rely on the de minimis theory to justify expensing 61 minor items, costing $34,143.79, but that it could reclassify any of the 61 items into categories which I held properly chargeable to expense accounts.

The Company has submitted a schedule reclassifying 27 of the 61 items, costing $15,915.52, into approved categories. The

Government does not concede the propriety of the Company's accounting decisions, but admits that the Company's reclassification is consistent with the principles announced in my opinion. I therefore find that the 27 items were properly charged to cost of production accounts.

The Government now concedes that 2 of the 61 minor items, nos. 242 and 279, costing $1,801.89, were proper repair and maintenance expenses. The original opinion is modified to reflect this concession.

The remaining 32 minor items are disallowed and their cost, $16,396.38, is included in the judgment for the Government.

I have held that the foregoing adjustments in the Company's costs require reformation of the 58.77 cent ceiling price in the parties' 1961 agreement. The parties agree that application of the adjusted costs to the formula embodied in the 1961 agreement results in a reformed ceiling price of 57.53 cents per pound, a reduction of 1.24 cents. The Government is therefore entitled to recover $27,111.49, the amount it overpaid the Company for 2,186,409 pounds of nickel delivered under the 1961 agreement.

In the 1964 termination agreement between the parties, the Company agreed to pay the Government any reduction in the 58.77 cent ceiling price times 17,313,-454, the number of pounds of nickel upon which the termination payment was based. The Government is therefore entitled to recover $214,686.83 under the 1964 agreement.

In its complaint, the Government alleged that it was entitled to interest from the dates of payment on the overpayments made under Contract DMP–50 and the 1961 agreement. (The Government does not seek pre-judgment interest on the adjustment made in the 1964 termination payment, negotiated after this action was filed.)

This is a classic case of unjust enrichment. From the dates of over-payments, the Company has had the use of the Government's money. The amounts of the overpayments, as well as the dates, have always been subject to ready calculation, once the existence of a breach was determined. I have held that the Company breached the contract only in those instances where it was unable to justify its accounting decisions under the standard of generally accepted accounting practices. The Government is entitled to interest at the rate of six per cent per annum from the dates of overpayment, both on the $231,-506.28 overpaid under Contract DMP–50 and on the $27,111.49 overpaid under the 1961 agreement.

This supplemental opinion, together with the opinion filed on February 24, 1966, shall constitute my findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P. Judgment shall be entered for the plaintiff in accordance with these opinions.