400 F.2d 944
 UNITED STATES of America, Appellant,
v.
HANNA NICKEL SMELTING COMPANY, a corporation, and the Hanna Mining Company, a corporation, Appellees.
HANNA NICKEL SMELTING COMPANY, a corporation, and the Hanna Mining Company, a corporation, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 21232.
 United States Court of Appeals Ninth Circuit.
 September 23, 1968.
 
 David L. Rose, (argued) Martin Jacobs, Attys., Dept of Justice, Barefoot Sanders, Asst. Atty. Gen., Washington, D. C., Sidney Lezak, U. S. Atty., Portland, Or., for appellant.
 James H. Clarke, (argued) of McColloch, Dezendorf & Spears, Portland, Or., H. Chapman Rose and Ellis H. McKay, of Jones, Day, Cockley & Reavis, Cleveland, Ohio, for appellee.
 Before MADDEN,* Senior Judge of the United States Court of Claims, and MERRILL and CARTER, Circuit Judges,
 JAMES M. CARTER, Circuit Judge.
 
 
 1
 The United States filed the action below against the appellees (hereafter referred to as Hanna), to recover $1,738,558 for breach of the accounting provisions of a government contract; and also sought an additional $249,598 based upon a claim for reformation of two subsequent contracts between the parties.
 
 
 2
 The trial court awarded judgment to the United States in the sum of $560,632.89, made up of the following items:
 
 
 3
 (1) $231,506 for items which the trial court held represented capital improvements and which were improperly expensed as costs of production;
 
 
 4
 (2) $241,798.32, resulting from a reformation of the contract as it related to the price to be paid by the government to Hanna for ferronickel;
 
 
 5
 (3) $87,328.57 allowed as pre-judgment interest on certain amounts of money.
 
 
 6
 Cross-appeals followed. The United States contends that the contract was not ambiguous and that Hanna wrongfully expensed items which should have been capitalized; that additional amounts on various items should have been allowed the government. The United States also contends that the court's alternate holding of estoppel by acquiescence was erroneous.
 
 
 7
 Hanna in its cross-appeal contends that the district court erroneously reformed the contract resulting in the portion of the award shown above, and erroneously allowed prejudgment interest as shown above.
 
 
 8
 The facts are generally contained in the opinion by the district judge in United States v. Hanna Nickel Smelting Company, et al., 253 F.Supp. 784 (D.C. Or. 1966).
 
 
 The Appeal by the United States
 
 
 9
 The district court found that the contract was ambiguous and we agree. It took testimony from accounting experts and on conflicting testimony interpreted the contract in favor of Hanna. We are satisfied with the trial court's disposition of this phase of the case as shown in the opinion (253 F.Supp. pp. 787-792).
 
 
 10
 As to the alternate ground of decision (253 F.Supp. pp. 793-795) under the subtitle "Equitable Issues," and involving estoppel against the United States by acquiescence, we express no opinion.
 
 
 Hanna's Appeal
 
 
 11
 We are satisfied with the trial court's disposition of the questions raised by the cross-appeal of Hanna under the subsection "Reformation" (253 F.Supp. at 795). However, the court did not go into detail in connection with the problem of reformation and we therefore consider it briefly hereafter.
 
 
 12
 We are satisfied with the trial court's disposition of the matter of prejudgment interest (253 F.Supp. at 796).
 
 
 The Reformation Issue
 
 
 13
 Hanna's obligation to deliver nickel was to deliver 125,000,000 lbs or deliver until June 30, 1962, whichever occurred first. By early 1961 Hanna had delivered all but 19,500,000 lbs., about a year's production.
 
 
 14
 The contract before the amendment which is involved in this case, provided as to price, the lower of two figures (1) the cost of production, or (2) the agreed ceiling price.
 
 
 15
 Amendment No. 5 was negotiated. Dated April 20, 1961, it was effective as of March 31, 1961. It read in part as follows:
 
 
 16
 "* * * The 19,499,863 pounds of contained nickel shall be produced by the Contractor after March 21, 1961 and shall be delivered to the Government at such time or times after March 31, 1961 and prior to June 30, 1965, as the Contractor in its sole discretion shall determine, at a price per pound of contained nickel which shall be equal to (a) the Contractor's average actual cost of production per pound of contained nickel in the calendar year in which such ferronickel is delivered to the Government or (b) $0.5877, whichever is less."
 
 
 17
 It extended Hanna's time to deliver the balance of the nickel contracted for to June 30, 1965, and relieved Hanna of its contractual obligations to operate the smelter at maximum capacity and to deliver all products to the government.
 
 
 18
 The court found that the ceiling price of 58.77 cents "was computed by an agreed formula which was based upon the difference between the company's cost of production in 1959 and 1960." The court found that Hanna had improperly included in its 1959 and 1960 cost figure, as expense, over $215,000 of capital expenditures, the effect of which was to raise the ceiling price.
 
 
 19
 The court reformed the contract so as to compute a ceiling price by applying the true cost figures. This meant a reduction of 1.24 cents per lb. and a ceiling of 57.53 cents per lb. The award in the judgment was computed on this ceiling.
 
 
 20
 This part of the judgment in favor of the government amounted to $241,798.32 plus interest of $87,328.57, a total of $329,126.89. It was computed on a difference of 1.24 cents per lb. on 2,186,409 lbs delivered under the amended agreement and 1.24 cents per lb. on an additional 17,313,454 lbs. covered by a final termination agreement.
 
 
 21
 After the amendment and on March 5, 1964, the contract was terminated. Hanna as part of termination, paid the government the difference between the 58.77 ceiling price and the market price of nickel and was relieved of the obligation to deliver the 17,313,454 lbs. This action was then on file and the parties agreed that if the prayer for reformation was granted, Hanna would pay the price reduction, times the number of undelivered lbs. The reformed price thus applied to the last 17,513,454 lbs. There is no dispute as to the computations.
 
 
 22
 Lengthy negotiations were had and correspondence exchanged between Hanna and GSA, which by this time was the government agency handling the contract.
 
 
 23
 As Hanna had continued with its production, its operation had become more efficient. The government had agreed to purchase all salable ferronickel produced for ore up to 125,000,000 lbs of contained nickel at a price equal to the cost of production plus an amount (payable over the first 95,000,000 lbs only) sufficient to amortize the advance of capital and interest. By the end of September 1960, the advances had been paid and no further amortization payments were required.
 
 
 24
 Between March 31, 1961, and January 1, 1962, Hanna delivered 2,186,409 lbs of nickel. Production costs for the period were 61.95 cents per lb., the ceiling was 58.77 cents per lb. Hanna was paid at the 58.77 rate.
 
 
 25
 During the negotiations Hanna had suggested a figure of 60 cents per lb or its cost of production, whichever was lower. Hanna had advised the government that 60 cents was its "approximate" 1960 production cost. The record shows that both parties knew it was a tentative figure, subject to later audit and confirmation.
 
 
 26
 After conferences and letters exchanged, GSA, acting for the United States, wrote its letter of March 9, 1961. In it GSA set forth calculations of Hanna's production costs for 1959 and 1960, showing a decrease of 1.2 cents per lb in 1960 over 1959, and calling attention to non-recurring charges in 1959 and 1960. Although these calculations were neither called or designated "a formula," this is what they were.
 
 
 27
 The GSA letter continued, "We think it is reasonable to project a production cost for 1961 at $.5877 per lb * * *" [Emphasis added]. The letter speaks of Hanna's earlier "proposal" but nowhere in the letter does GSA term its letter of March 9, 1961, a "proposal."
 
 
 28
 Hanna replied by its letter of March 14, 1961, stating "* * * that Hanna Nickel Smelting Company accepts the proposal set forth in your letter of March 9, 1961, in regard to terminating Contracts DMP-49, DMP-50, and DMP-51, and substituting provisions to extend to June 30, 1965, the balance of deliveries under present Contract DMP-50 at a price of $.5877 per lb of contained nickel or our average cost of production per year whichever is lower * * *". [Emphasis added].
 
 
 29
 The United States contends that the "formula" was part of the agreement. Hanna says No, it was a flat agreement to buy and sell at 58.77 cents per lb. The trial court found the "formula" was part of the agreement and reformed the contract and the price to 57.53 cents per lb.
 
 
 30
 The case was fully pretried. A mass of documentary material was assembled. On the issue we are considering, depositions were before the court.
 
 
 31
 O'Dwyer for GSA testified by way of deposition. As contended by Hanna, he was generally stating his view and his intentions. However, in the deposition he testified without objection, "Well, we decided the best way to approach it was to take the actual difference between the 1959-60 costs and deduct that as represented by cost per pound of nickel from the 60 cents figure, after certain adjustments were made, with respect to non-recurring costs such as the paving for the stockpile area." [Emphasis added]. The record is uncertain as to whether "we" meant GSA or the negotiating parties. It was not later cleared up on direct or cross. In fact there was no cross-examination by Hanna.
 
 
 32
 We cannot say it was absolutely certain what Hanna meant when it wrote accepting "your proposal." The formula was included in GSA's letter. Moreover, the GSA letter, following figures on the formula, stated, "We think it reasonable to project a production cost for 1961 at .5877 per lb * * *".
 
 
 33
 "Project" means to "* * * to contrive, devise; scheme; as to project a plan." Webster New International Dictionary, Second Edition. It speaks of the future. It certainly does not apply to a past figure or price. It appears the United States was setting a tentative figure, a projection to be later ascertained when the final '59-'60 figures were available. It appears that when Hanna accepted the "proposal" it accepted the formula and the projection as tentative, subject to revision.
 
 
 34
 The trial court found that the parties agreed to the formula. The intent of the parties was a question of fact. In Lundgren v. Freeman, 307 F.2d 104, 113 (9 Cir. 1962), this court stated in a case with striking parallels,
 
 
 35
 "We may not substitute our judgment [as to whether a contract should be reformed] if conflicting inferences may be drawn from the established facts by reasonable men, and the inferences drawn by the trial court are those which could have been drawn by reasonable men."
 
 
 36
 Hanna in its brief, speaks of "gross inequity." Certainly it was not equitable to refuse to allow $215,000 in alleged costs to affect the ceiling price, which costs the court found "the Company's [own] witnesses frankly admit to be capital items" and were improperly expensed.
 
 
 37
 The entire contract was beneficial to Hanna. The United States needed a supply of nickel and in order to get it, financed the project so that the cost of the plant was amortized out of the amounts paid Hanna for the nickel. Hanna wound up with the plant for a figure representing only a portion of the cost of the plant.
 
 
 38
 The trial court was confronted with a very difficult case. It approached the problem in an orderly and intelligent manner. Its printed opinion is an excellent example of good judicial work. Its decision was neither pro-Hanna or pro-United States. The trial judge took up the problems' seriatim and "called them as he saw them."
 
 
 39
 We find no error of law and we cannot say the trial court was "clearly erroneous" in its factual determinations.
 
 
 40
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 *
 Sitting by designation
 
 
 
 41
 J. WARREN MADDEN, Judge (dissenting).
 
 
 42
 With deference, I am unable to agree with the court's conclusion that "smelter accounting" applies to that part of this case dealing with the appeal by the United States. As more fully set out in the opinion of the district court, this aspect of the case concerns the proper accounting method to be employed under the contract between the government and Hanna.
 
 
 43
 The government contends that the contract itself set out the accounting procedure to be employed and that Hanna, by "expensing" 216 items worth some $1,400,000 which should have been capitalized, failed to follow the contract procedure. Alternatively, the government contends that should the court find the accounting provisions of the contract ambiguous and conclude that resort to some external standard is necessary to interpret the contract, then that standard should be the "generally accepted accounting practice" provided for under Article VI of the contract.[1] Under the government's alternate theory 201 Items worth some $1,373,000 were incorrectly expensed because "generally accepted accounting practice" would not have permitted that to be done.
 
 
 44
 Hanna rejects the government's primary contention that the contract spells out its own accounting procedure and has agreed throughout this controversy that the properly applicable accounting standard is that of "generally accepted accounting practice." There is a million dollar difference, however, between Hanna's definition of the "generally accepted accounting practice" referred to in Article VI and the definition urged by the government. Hanna contends that "generally accepted accounting practice" under the contract means generally accepted accounting practice in the smelting industry. The government's position is that the expression "generally accepted account practice" speaks for itself and does not refer to accounting practice unique to the smelting industry.
 
 
 45
 The difference is significant because the smelting industry follows the peculiar accounting practice of treating a smelter as a single capital unit and expensing the cost of replacement parts and even capital improvements, regardless of their usefulness, unless such replacements or improvements materially increase the capabilities or value of the entire smelter considered as a whole. Generally accepted accounting practice outside of the smelter industry would, of course, generally capitalize long-lived replacements and improvements. It is not contested in this litigation that, outside of the smelting industry 201 of the disputed items which Hanna expensed, in the amount of some $1,373,000, would properly have been capitalized.
 
 
 46
 I concur with the district court and this court that the accounting provisions of the contract are ambiguous and that because of this ambiguity the contract must be interpreted in light of "generally accepted accounting practice" as that term is used in the instant contract. I cannot, however, agree with the conclusion of the district court, concurred in by this court, that the parties by their use of that language "intended to apply accounting practices common to the smelting industry."
 
 
 47
 The record does not reflect any intention on the part of Hanna, at the time the contract was negotiated, to apply smelter accounting. The evidence presented by both parties regarding the lengthy negotiations leading up to the final draft of the contract indicates that the government was particularly concerned that it retain some check on the amount of money spent by Hanna in constructing the smelter. Hanna's initial draft of the language which became Article VI 1(c) of the contract provided that capital advances were to be available for "such replacements, additions, or improvements of the Facility which are deemed necessary or advisable by the Contractor. * * *" The government negotiators objected that this proposal would give Hanna the unrestricted right to construct any kind of facility it desired. As a result, Article VI 1(c) of the contract as finally agreed to provided that capital advances were to be available, "for such replacements or improvements of the Facility which are agreed by the Contractor and the Government to be necessary or advisable * * *." (Emphasis added.) Hanna admits in its brief that the requirement of government consent to expenditures for replacements and improvements was added to the language of Article VI 1(c) to meet the government's demand that it have control over such expenditures.
 
 
 48
 The court's interpretation of the contract ignores this history of the contract negotiations and renders substantially meaningless the final language of Article VI 1(c). For under "smelting accounting" the expenditures for replacements and improvements over which the government insisted it have control are almost always expensed rather than capitalized. If smelter accounting was to be applied, Hanna could (as it did in fact) charge such expenditures to "Working Capital Advances" under Article VI 2 rather than to "Capital Advances" under Article VI 1 and thereby avoid altogether the control provision which the government was careful to include in Article VI 1 (c). The Court's application of smelter accounting to the contract thus puts the government right back in the position it refused to accept when it rejected Hanna's original contract draft. It is inconceivable to me that the government "intended" to give away under the guise of accounting procedure the control over expenditures for replacements and improvements which it insisted upon — and obviously thought it had gained — throughout lengthy contract negotiations.
 
 
 49
 The application of smelter accounting to the contract was, of course, greatly advantageous to Hanna,[2] and correspondingly disadvantageous to the government. If Hanna had the use of smelter accounting in mind when negotiating the contract, Hanna must also have known that that idea was exactly contradictory to the government's insistence that it retain control over expenditures for replacements and improvements. If smelter accounting was to be the applicable accounting procedure, the government's signing of the contract containing Article VI 1 (c) was an irrational act on the part of the government's contracting officials. Hanna had no reason to believe that, after the long and careful negotiations leading up to the final draft of the contract, the government officials at the last moment before signing, lost their reason. I can imagine no circumstances under which a tribunal, asked to interpret a contract, as to the meaning of which the parties disagree, can properly, by its interpretation impose upon one of the parties an agreement which he never, while in his right mind, would have made.
 
 
 50
 As an alternative ground of decision, the district court held that the government was estopped by acquiescence from challenging expenditures in the amount of some $320,000 incurred by Hanna after January 1, 1968. The district court found that the government auditors knew of the disputed accounting practices by the end of 1957 but failed to protest at that time or at any time prior to expiration of the contract. The government's silence, the district court concluded, led Hanna to continue using the disputed accounting practices and should now bar the government's subsequent challenge of those practices.
 
 
 51
 The government does not deny that its auditors knew by 1958 that Hanna was using the disputed accounting practices. The government contends, however, that estoppel is inapplicable here because Hanna did not detrimentally change its position in reliance upon the government's silence.
 
 
 52
 Detrimental reliance is, of course, an essential element of estoppel. 3 Pomeroy, Equity Jurisprudence (5th ed.) pp. 191-192; Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104, 84 A.L.R.2d 454 (9th Cir. 1960). It is not disputed that Hanna had adopted its practice of expensing rather than capitalizing replacements and improvements before the government auditors learned of the practice. There was, consequently, no change of position by Hanna in the usual sense as a result of the government's failure to protest earlier. The district court, however, relying upon Mahoning Investment Co. v. United States, 3 F.Supp. 622, 78 Ct.Cl. 231 (1933), cert. denied 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934), concluded that a change of position was unnecessary where acquiescence is the ground for estoppel for in such a situation the party `relies" by continuing his established practice.
 
 
 53
 The question remains here, however, as to whether such "reliance" was detrimental to Hanna. In Mahoning, plaintiff corporations agreed with the Internal Revenue Service that a certain tax assessment was proper and paid the tax. After the statutory period, during which the government might have reassessed the tax, had run, plaintiffs sued for a refund alleging that improper procedures had been followed in collecting the tax. Plaintiffs were estopped to assert the admitted illegality of the collection procedure because of the obvious prejudice to the government if a refund were to be allowed after the statute of limitations on reassessment had run.
 
 
 54
 No such prejudice is present here. Hanna argues that if the government had objected to its accounting procedures in 1958, Hanna might have been able to work out an acceptable procedure at that time or might have refrained from making some of the disputed expenditures which it subsequently made. That Hanna might have done something different if the government had spoken sooner is not the kind of detrimental reliance upon which an estoppel is based. Hanna might also have stood by its position then as it does now rather than refrain from making capital expenditures for equipment which it would upon expiration of the contract in 1961 be able to acquire for 7½% of cost or admit there was anything wrong with the procedure under which it had, by 1958, already expensed replacements and improvements in the amount of some $841,000. This kind of speculative hindsight affords no grounds for an estoppel.
 
 
 55
 I would allow the government the full amount of the 201 items improperly expensed under generally accepted accounting practice outside of the smelting industry and would adjust accordingly the amount found owing the government under that part of the court's opinion dealing with the reformation issue.
 
 
 
 Notes:
 
 
 [1]
 (1) Upon the Contractor's written request, the Government will make advances (hereinafter called "Capital Advances") of the entire amount up to a total of $22,000,000 * * * required (a) to test the process [in France], (b) to construct, equip, design and rebuild the Facility contemplated by Article IV * * *, (c) for such replacements or improvements of the Facility which are agreed by the Contractor and the Government to be necessary or advisable during the period of this Contract, and (d) for such other necessary and so agreed upon expenditures which, in accordance with generally accepted accounting practice, are capitalized
 (2) Upon the Contractor's written request from time to time * * * the Government will advance to the Contractor sums (hereinafter called "Working Capital Advances") representing its reasonable minimum working capital requirements [so long as the amount outstanding does not exceed $2,800,000]. * * * Working Capital Advances may be requested and used by the Contractor to pay any costs and expenses hereunder of the Contractor * * * not covered by Capital Advances * * *.
 
 
 [2]
 The contract gave Hanna the option to purchase the smelter for its own commercial use at the end of the contract period for a sum equal to 7½ per cent of the total "Capital Advances" advanced to Hanna under Article VI 1 of the contract. Using smelter accounting, Hanna was able to purchase over a million dollars worth of replacements and improvements without seeking the government's approval and upon subsequent exercise of the purchase option to escape paying anything for the property so purchased